IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID L. KING, | No. CIV S-03-2505-FCD-CMK-P |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| DAVID L. RUNNELS, et al., | |
| Respondents. | |
| _____/ | |

Petitioner, a state prisoner proceeding with appointed counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] This action proceeds on petitioner's amended petition (Doc. 53) filed on August 28, 2006.  Respondents filed their answer (Doc. 64) on March 15, 2007.  Petitioner has not filed a traverse.

///

///

///

///

---

[1] Counsel was appointed by order issued on June 30, 2004, "[i]n light of the length of petitioner's sentence. . . ."

1

# I. BACKGROUND

**A.  Facts**[2]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> During the evening of September 24, 1999, 86-year-old M.P. was sitting on her front porch with her next door neighbor, S. About 8:00 p.m., S. left and M.P. went inside. After checking on her cats, M.P. went into the bathroom. When she came out, she encountered defendant, whom she described as a "quite light skinned" African American man, and told him to get out.
>
> Defendant walked toward the kitchen and M.P. followed. He grabbed her, threw her to the floor and got on top of her, causing her to scream. Not knowing what he was going to do, M.P. offered him money. They went to M.P.'s bedroom where she removed $200 "in 20's" from an envelope and counted out $180, telling him that she had to keep $20 for groceries. Defendant took the $180 and fled. M.P. denied both knowing defendant and having spoken with him regarding landscaping or having a problem with mosquitoes.
>
> S., who was in her kitchen, heard M.P. yell, "Who are you, get out, get out." S. saw a man standing with M.P. and then heard M.P. scream. S. called 911. In the 911 tape of S.'s call, which was played for the jury, S. described the man to the 911 operator as white and wearing a green T-shirt. S. told the operator that she could see into M.P.'s bedroom window, that M.P. was counting out money, and then she saw the defendant leave and jump over the back fence.
>
> Officer Sherry Bell responded to S.'s 911 call. Within three minutes of having received the information that the suspect was exiting M.P.'s residence, Bell saw defendant, whom she thought matched the description, about a block from M.P.'s home. As she drove by him they made eye contact and he ran. She gave chase on foot but lost sight of him when she tripped and fell. However, Officer Jeanette Areia, who had joined the chase, saw defendant run into an apartment complex. Areia then heard screams coming from apartment No. 8.
>
> Defendant had entered the apartment of K.B. K.B. yelled to defendant that he was in the wrong apartment. Defendant offered K.B. either $108 or $180, she could not be sure, to let him stay. K.B. declined the offer and defendant fled by climbing out the bedroom window. Officer Bell saw defendant climb out of K.B.'s window and captured him.

---

[2]  Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

   At the time of his capture, defendant had exactly $180 in 20-dollar bills in his pants pocket. An officer found M.P.'s flashlight in the area where Officer Bell had first observed defendant. Defendant's fingerprints were found on M.P.'s kitchen window screen, the kitchen window having been determined to be the point of entry.
   Defendant testified that the day M.P. was robbed he spoke with her about doing landscaping and helping her with a problem she was having with flies and mosquitoes in her home. She refused both offers and he went to his nephew's home nearby where he drank and gambled. Defendant returned to M.P.'s home to look at her yard and knocked on the door. When she did not answer, he let himself into the backyard to check on her screens because of her fly and mosquito problem. He went back to his nephew's where he continued to drink and gamble. When he left his nephew's home, he returned to M.P.'s home, but she was still not there.
   After leaving M.P.'s residence, defendant saw police cars. Because he was on parole and had been drinking, he did not want to get involved with the officers, so he jogged away. At one point, he stopped and vomited because he was so intoxicated, and when he looked up he saw someone that he did not know pointing a gun at him. He ran into an apartment, tried to explain to the lady occupant that he was being chased by someone with a gun, but the lady told him to get out. Realizing he did not belong there, he "freaked out" and climbed out the bedroom window.

### B.  Procedural History

After petitioner's first trial ended in a mistrial because the jury had deadlocked, petitioner was convicted following a second trial of robbery and burglary. The trial judge found true that petitioner had four prior convictions – two for first degree burglary, one for second degree burglary, and one for theft with a prior related theft conviction. Petitioner was sentenced to 25 years to life, plus 12 years. On direct appeal, petitioner's sentence was modified to appropriately reflect custody credits, but the judgment was otherwise affirmed. The California Supreme Court denied direct review without comment or citation.

Petitioner then filed five separate state habeas corpus petitions. The first petition, which was filed in the Sacramento County Superior Court, was dismissed for lack of jurisdiction on September 17, 2001. In that petition, petitioner claimed that the probation report had "false accusations." The court dismissed this petition because petitioner should have, but did not, raise the claim on direct appeal. Petitioner's second state habeas petition was also filed in the Sacramento County Superior Court and dismissed for lack of jurisdiction on November 7, 2001.

Petitioner had raised the same claim as in his first state habeas petition.  Petitioner's third state petition – also filed in the Sacramento County Superior Court – was denied on April 29, 2002.  In this petition, petitioner challenged the priors.  Petitioner's fourth state habeas petition was filed in the California Court of Appeal and was denied on May 15, 2003, without comment or citation.  Finally, the fifth petition was filed in the California Supreme Court and also denied without comment or citation.

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

/ / /

/ / /

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

Under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

1   State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 123 S.Ct. at 1175. This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III.  DISCUSSION

In his amended federal habeas petition, petitioner raises the following claims: (1) tainted in-court identification; (2) ineffective assistance of trial counsel for failing to object to the tainted in-court identification; (3) cruel and unusual punishment; (4) ineffective assistance of trial counsel for failing to renew a motion to suppress evidence.[3]

**A.     In-Court Identification**

As to the in-court identification, the state court held:

> Defendant filed a motion for a new trial claiming he was denied due process "based on the grounds that the in[-]court identification by [M.P.] of [him] as the perpetrator of the crime was deliberate false testimony . . . ." This was so, he claimed, because in his first trial, which resulted in the jury deadlocking, M.P. had "looked directly at [him] and was not able to identify him as the person who robbed her" whereas at the second trial M.P. "said that he was in fact the person that robbed her." The court denied the motion, observing that even if M.P. had deliberately changed her testimony, in light of the other evidence the error was harmless.
>
> Apparently recognizing the absurdity of his argument in the trial court that M.P. had intentionally falsified her testimony, defendant now argues that the trial court erred in denying his new trial motion because his in-court identification by M.P. [was] irreparably suggestive, thereby depriving him of due process. While ordinarily we would reject this new argument for failure to have presented this fact to the trial court, there is no need to do so on this record. We reject the argument for the same reasons given by the trial court, namely, since the evidence against defendant, as we describe below, was overwhelming, any error regarding M.P.'s identification was harmless.
>
> M.P. described her assailant as a light-skinned African American with a thin build who was wearing a green T-shirt. Defendant matches this physical description. S. saw the assailant and described him to the 911 operator as white, which is not very dissimilar to being a light-skinned African American, and wearing a green T-shirt. Within three minutes of the assailant having fled out the back door of M.P.'s home, Officer Bell saw defendant whom she believed matched the given description just a short distance from M.P.'s residence. Defendant was wearing a green T-shirt. After making eye contact with defendant, he fled, thereby showing a consciousness of guilt. Bell gave chase but lost sight of defendant when she fell. However, Officer Areia, who saw Bell chasing

---

[3]     While the amended petition also raised a fifth claim based on unreasonable search and seizure under the Fourth Amendment, that claim was summarily dismissed. See Stone v. Powell, 428 U.S. 465 (1976); Gordan v. Duran, 895 F.2d 610 (9th Cir. 1990); Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994).

>defendant, saw defendant run into an apartment complex and then heard a scream coming form an apartment.  Defendant was observed climbing out of an apartment window and was then taken into custody by Officer Bell.  M.P. had given defendant $180 in $20 bills, and at the time defendant was apprehended he had $180 in $20 bills on him.  Additionally, another officer found M.P.'s flashlight, which M.P. had seen on her kitchen floor when the assailant attacked her, at the sight [sic] where Bell first encountered defendant.  Moreover, defendant's fingerprints were found on the window sill of M.P.'s kitchen window, which was determined to have been the point of entry into her home.  Finally, the prosecutor's argument for conviction was based on the above-cited evidence rather than on M.P.'s identification of defendant.
>	Given this state of the record, it is clear beyond a reasonable doubt that even in the absence of any identification of defendant by M.P., the jury would have concluded that he was M.P.'s assailant and, therefore, convicted.  Hence, the assumed error would be harmless.  (citing Chapman v. California, 386 U.S. 18, 24 (1967)).

Petitioner now argues that he was denied a fair trial ". . .when the only eye-witness identified petitioner at the second jury trial even though she had been unable to identify petitioner at all previous show-ups and proceedings."  According to petitioner, the legal basis for this claim is Manson v. Braithwaite, in which the Supreme Court held that due process protects against the use of evidence derived from unreliable identifications that resulted from impermissibly suggestive procedures.  432 U.S. 98 (1977).  Thus, it appears that the essence of petitioner's present due process claim is that his trial was unfair due to impermissibly suggestive procedures used in the course of M.P.'s in-court identification.  He does not, however, point to any improper procedures.  Rather, petitioner cites to Neil v. Biggers, in which the Supreme Court set forth the factors to be considered in determining reliability.  409 U.S. 188 (1972).  Petitioner then argues that, under these factors, M.P.'s identification was not reliable and, therefore, "unduly suggestive."

At the outset, the court observes that, from a defendant's point of view, all identifications are unduly suggestive – they suggest the defendant is guilty.  However, as the Supreme Court pointed out in Watkins v. Sowders, identification testimony is merely a form of evidence and does not go to the very heart of the adversary process.  449 U.S. 341, 347-48 (1981).  Citing to Manson, the Court in Watkins added that counsel can cross-examine the

identification witness and argue to the jury the factors which cast doubt on reliability. See id. at 348-49. In this case, petitioner's counsel had such an opportunity, and petitioner does not argue otherwise.

Moreover, because identification testimony evidence does not go to the heart of the criminal trial process, any error resulting from improper admission of such testimony must be non-structural and, therefore, subject to harmless error analysis. See e.g. See Bockting v. Bayer, 399 F.3d 1010, 1022 (applying harmless error analysis to a claim challenging admission of hearsay testimony), overruled on other grounds by Whorton v. Bockting, ___ U.S. ___ (Feb. 28, 2007). For the reasons articulated by the state court, this court also concludes that any assumed error with respect to admission of the identification testimony in this case was harmless under Brecht v. Abramson, 507 U.S. 619 (1993). In particular, given the weight of all the other evidence against petitioner, admission of M.P.'s in-court identification at the second trial could not have had a substantial and injurious effect or influence on the verdict. In other words, even if the identification evidence had not been admitted, the result would have been the same.

Therefore, the court concludes that the state court's denial of this claim was neither contrary to nor an unreasonable application of federal law. To the contrary, the state court reached the correct result under Brecht.

### B. Cruel and Unusual Punishment

Petitioner argues:

> There are limits to the state's power to punish. Petitioner had a history of theft related offenses and never spent more than 5 years, 8 months in prison. A majority of his prior convictions were for non-violent drug offenses, the probation report bears this out.

Petitioner cites to the Supreme Court's 1983 decision in Solem v. Helm, 463 U.S. 277 (1983), in

support of his argument that his current sentence is unconstitutionally cruel and unusual.[4] As to this claim, the state court held:

> Defendant contends that his sentence of 25 years to life plus 12 years for enhancements constitutes cruel and unusual punishment under the state and federal constitutions. In support of this claim he makes a single assertion unsupported by either citation to the record, statement of the law, or analysis of the facts, namely, that the sentence is cruel and unusual because his offenses, present and prior, are the product of his drug addiction.[5] "It is elementary that an appellate court will not consider assignments of error based upon asserted matters not shown by the record and supported by nothing more than statements in appellant's brief." (citation omitted). Consequently, the point is waived.

Regarding the asserted factual basis for this claim – that a majority of petitioner's prior convictions were for non-violent drug offenses – petitioner is simply wrong. The state court outlined petitioner's criminal history as follows:

> Perhaps defendant failed to make any application of the facts of his case to the law relating to cruel and unusual punishment because the record shows the following convictions for him: In February 1982, misdemeanor burglary; in October 1982, residential burglary; in May 1983, possession of cocaine; in May 1985, residential burglary; in November 1987, second degree burglary; in March 1989, possession of narcotic paraphernalia; in September 1989, petty theft with a prior; September 1991, petty theft with a prior; and in November 1994, second degree burglary.

Of the nine prior convictions mentioned by the state court, only two are drug-related. This is certainly not a majority as petitioner suggests.

As to the merits of petitioner's claim, in light of petitioner's numerous prior burglary convictions, and in light of the state's legitimate interest in preventing recidivism, the state certainly had a reasonable basis for imposing a life sentence. See Ewing, 538 U.S. at 25, 28. The court concludes that, given petitioner's history of repeated residential burglaries, his

---

[4] It is puzzling that petitioner does not refer at all to the most recent Supreme Court case on this issue – Ewing v. California, 538 U.S. 11 (2003).

[5] As respondents note, petitioner makes no mention of drug addiction in the instant petition. Thus, this claim is probably not exhausted. Nonetheless, the court will address the merits.

sentence was not grossly disproportionate. Therefore, the state court's rejection of this claim was neither contrary to nor an unreasonable application of Ewing.

### C. Ineffective Assistance of Counsel

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See id. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. See id. at 690. The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. See id. In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

Petitioner argues that his trial counsel was ineffective for: (1) failing to object to

the in-court identification testimony from M.P.; and (2) failing to renew his motion to suppress evidence based on improper search and seizure.

### 1. Failure to Object to In-Court Identification

Petitioner argues that defense counsel was ineffective because he ". . . did not object to the introduction of [the in-court identification] evidence or otherwise hold the prosecution to their burden of proof." He does not, however, suggest what legal argument his attorney could have made to exclude M.P.'s identification testimony. Regardless, the court concludes that this claim is foreclosed by its analysis of petitioner's claim that he was denied a fair trial by admission of the identification testimony. Specifically, there was absolutely no basis for an objection or a motion to exclude the testimony. Therefore, trial counsel could not have been deficient for not raising such a motion. Further, the trial record reflects that petitioner's counsel cross-examined M.P. concerning her in-court identification. Specifically, he questioned her about her failure to identify petitioner at petitioner's first trial.

### 2. Failure to Renew Motion to Suppress

Petitioner filed a motion to suppress in the trial court. That motion was "dropped" because it was not filed as a motion in limine to be heard by the trial judge. The motion was never renewed as a motion in limine prior to trial. Petitioner now contends that his trial counsel's failure to renew the motion at the proper time resulted in ineffective assistance of counsel.

As to the basis for a motion to suppress, petitioner states that Officer Bell "did not have reasonable articulable suspicion that petitioner had committed a crime when she attempted to detain him." This contention is simply not supported by the facts of the case. Officer Bell first attempted to detain petitioner a short time after S.'s 911 call and after she made eye contact with petitioner – who matched the description of the suspect – and after he attempted to flee. These facts certainly gave Officer Bell reasonable suspicion to detain petitioner as a suspect in the crime against M.P. Therefore, the motion to suppress petitioner argues his attorney should have renewed would have been meritless. Counsel was not deficient for not raising such a motion.

## V.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's amended petition for a writ of habeas corpus be denied and that the Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  June 18, 2007.

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE